UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| DAVID NEAULT and ANDREA NEAULT, husband and wife and the marital community comprised thereof,<br><br>Plaintiffs,<br><br>vs.<br><br>EPLEY'S, INC., an Idaho corporation,<br><br>Defendant. | Case No.: 3:16-CV-00244-EJL-REB<br><br>**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ASSERT PUNITIVE DAMAGE CLAIM**<br><br>**(Docket No. 23)** |

Now pending before the Court is Plaintiffs' Motion to Amend Complaint to Assert Punitive Damages Claim (Docket No. 23). Having carefully considered the record, heard oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

I. **BACKGROUND**

On June 27, 2014, Plaintiff Andrea Neault was ejected from a raft on a section of the Lower Salmon River known as "Slide Rapid." Claiming to have suffered physical and emotional injury as a result, she and her husband, David, bring this action against their river guide, Defendant Epley's Inc., a licensed outfitter in the state of Idaho.[1]

---

[1] During this same rafting trip, another participant, Joseph R. Kane, died. His estate has also sued Epley's in this Court. *See Estate of Kane v. Epley's, Inc.*, Case No. 3:15-cv-00105-EJL-REB (the "*Kane* action"). Of immediate relevance here, the plaintiffs in the *Kane* action moved to amend their complaint to assert a claim for punitive damages and the Court granted that motion. *See Kane v. Epley's Inc.*, 2017 WL 1158242 (D. Idaho 2017). The factual and procedural circumstances surrounding both proceedings are similar, with the parties here making frequent reference to the *Kane* action. Similarly, this Memorandum Decision and Order largely parallels the Court's March 28, 2017 Memorandum Decision and Order allowing the plaintiffs in the *Kane* action to assert a claim for punitive damages.

**MEMORANDUM DECISION AND ORDER** - 1

Plaintiffs claim that Epley's conduct – in particular, its decision to run the Slide Rapid at flows above 23,000 cubic feet per second ("cfs") – breached the standard of care applicable to outfitters and guides under chapter 12, Title 6, Idaho Code and that said breach was a direct and proximate cause of Plaintiffs' injuries. *See generally* Pls.' Compl., ¶¶ 28-89 (Docket No. 1). Plaintiffs specifically allege:

> In the days leading up to the trip, Defendant's employees monitored the water levels of the Salmon River to determine whether the water levels were safe for the party to proceed. If water levels of the Salmon River exceeded 20,000 cubic feet per second . . . as recorded by the Bureau of Land Management, the river is not suitable for inexperienced whitewater rafters. When water levels of the Salmon River exceed 20,000 cfs, a cataract known as the "Slide Rapids" (the "Slide") is particularly hazardous to whitewater rafters. . . . .
>
> Plaintiffs' scheduled trip included a plan to navigate or "run" the Slide. Defendants never advised Plaintiffs of the dangerousness of the Slide at flows over 20,000 cfs. Defendant did not inform Plaintiffs that the Slide was a class V/VI rapid at the flows over 20,000 cfs. . . . .
>
> The water level on the Snake River did not decrease between June 24, 2014 and June 26, 2014. On June 26, 2014, Plaintiffs' group landed and took out at Eagle Creek to spend the night. This was the final campsite before the group reached the Slide. The Eagle Creek campsite is accessible by road. Defendant could have ended the trip at Eagle Creek. . . . .
>
> On June 27, 2014, Defendant's guides took Plaintiffs and their group down the river towards the Slide. Defendant's guides knew water levels over 20,000 cfs would produce extreme conditions at the Slide, notably Class V or VI rapids. Navigating Class V and VI rapids requires expert experience, specialized equipment, and rescue plans. Defendant's guides knew that inexperienced whitewater rafters should not attempt to raft Class V and VI rapids such as the Slide. . . . .
>
> Plaintiffs Andrea and David Neault were passengers in Raft #3. Andrea Neault was ejected from Raft #3 after it collided with a wall of water. David Neault watched his wife struggle in the cold and violent water. . . .
>
> Andrea Neault was adrift in the river for over 12 minutes. Defendant's guides failed to rescue Andrea Neault. Andrea Neault eventually drifted to shore. Andrea Neault was hypothermic and disoriented when she came out of the water. . . . .
>
> During the course of the trip, Defendant had authority to delay, modify or cancel the trip if it determined that the conditions on the river were unsafe for the

participants. Defendant was aware that, at the time of the June 24-27, 2014 trip, water flow on the Snake exceeded 20,000 cfs. Defendant had exclusive control of the rafts and all related equipment, as well as all decisions and planning concerning navigation of the river. . . . .

As a result of these events, Andrea Neault suffered contusions, abrasions, soft tissue injury, and emotional distress and continues to suffer psychological distress, manifested in physical symptoms including flashbacks, sleeplessness, loss of appetite, and elevated stress. As a result of these events, David Neault suffered emotional distress and continues to suffer psychological distress, manifested in physical symptoms including flashbacks, sleeplessness, loss of appetite, and elevated stress. . . . .

Defendant owed a duty to Plaintiffs to conform to the standard of care expected of a member of the profession while performing personal services as an outfitter in Idaho. I.C. § 6-1206. Defendant breached its duty to Plaintiffs by taking Plaintiffs on a trip down the Salmon River on June 24, 2014. . . . .

In guiding a group of inexperienced participants down the Salmon River, with river conditions such as they were on June 27, 2014, Defendant's conduct involved carelessness substantially greater than that which would constitute ordinary negligence.

*Id.* at ¶¶ 22-24, 28-30, 35-39, 44-47, 53-55, 58-61, 65-67, 71-72, 78-79, 88. These breach-of-the-standard-of-care allegations form the underlying bases for Plaintiffs' at-issue Motion.[2]

According to Plaintiffs, Epley's ignored and misrepresented to the group the extreme risks presented by the water levels forecasted to be encountered at Slide Rapid on June 27, 2014 (thus permitting the trip's June 24, 2014 launch in the first instance), and Epley's later decision to actually continue through Slide Rapid on June 27, 2014 at flows in excess of 23,000 cfs represented an extreme deviation from industry standards of care. *See generally* Mem. in Supp. of Mot. to Am., pp. 14-19 (Docket No. 23, Att. 3). Plaintiffs argue:

---

[2] These same allegations were made in the *Kane* action on the defendant's (Epley's) motion for summary judgment. There, U.S. District Judge Edward J. Lodge denied that motion, concluding that questions of fact permeated the interwoven issues of (1) the proper standard of care involved, (2) whether the defendant (Epley's) breached such standard of care, and (3) whether the defendant's (Epley's) conduct proximately caused the plaintiffs' injury and/or any actual loss or damage. *See generally Kane v. Epley's, Inc.*, 2016 WL 7155734, *7-14 (D. Idaho 2016).

**MEMORANDUM DECISION AND ORDER** - 3

> Defendant's manager, [Roger] Blackner, purposely misled . . . the group, by failing to inform them of actual (as of the June 24, 2014 launch date) and projected (for the anticipated encounter with Slide Rapid on June 24, 2014) river flows; it was fraudulent and outrageous for Mr. Blackner to say that the forecasted flow for Slide Rapid on June 27, 2014 was 17,000 cfs, when, in actuality, it was much higher.
>
> Defendant's manager, Blackner, told BSA's organizer, Marlene Schaefer, that Epley's followed "BLM criteria" in determining whether to launch on the Salmon River; he told Schaefer they would not launch if the water was above 20,000 cfs, the "go or no-go" limit. Schaefer was concerned about water levels because of poor weather; Blackner echoed those concerns and noted they might not be able to launch. He assured Schaefer he was watching the river. Blackner even told Schaefer they would take an alternative trip if the water was over 20,000 cfs and admitted it was Epley's responsibility to decide whether to launch or not. As the trip neared, Blackner expressed confidence that the water levels would be dropping every day and would be below the 20,000 cfs limit by launch.
>
> Despite these statements and assurances, on launch day Blackner failed to inform Schaefer (who was present with a BSA inspection team) that the water level was over 23,000 cfs, well in excess of Defendant's own stated cut-off policy. Instead he just said the water level would be dropping, and if it did not, Epley's would alter the plan and take out (at Eagle Creek) or run a different route. Blackner made it clear that the group would enter the canyon only at appropriate levels.
>
> Blackner also admits he told the rafters on launch day that the river would be at approximately 17,000 cfs when they were to hit the Slide. The forecast available that day, however, clearly refutes that claim. On launch day (June 24) the river level forecast for June 27 (the day the group would transit the Slide) was nearly 21,000 cfs – over 20% higher than Blackner's claim. In the week before launch, the forecasts had proved to be substantially lower than the actual river flow, which remained above 23,000 cfs the four days before launch. Defendant ignored the evidence that the forecasts were consistently and substantially wrong. Even if the forecasts had proved to be reliable, however, the day before the trip launched the forecast for June 27 was still nearly 19,500 cfs, not 17,000 as Blackner admits he told the group. Blackner admitted that he checked the USGS website that provided actual and forecasted river levels; consequently, he knew his statement that the river would be at 17,000 cfs by June 27 was false.

*Id.* at 17-19 (internal citations omitted); *see also* Reply in Supp. of Mot. to Am. p. 7 (Docket No. 25) ("Viewing the evidence in the light most favorable to the Neaults, . . . the water levels were forecasted to be higher than Epley's "no-go" limit and . . . Epley's knew about the high forecasts or should have known that the forecasts were substantially lower than the actual river flow,

**MEMORANDUM DECISION AND ORDER** - 4

which remained above 23,000 cfs the four days before launch. The fact that Blackner advised the group that water levels at the Slide on June 27 would be at 17,000 cfs was a false representation that evidences a harmful state of mind.").[3]

As it did in opposition to the plaintiffs' efforts to add a punitive damages claim in the *Kane* action, Epley's disputes these allegations outright and alternatively argues that, even if true, such allegations only support claims that it was grossly negligent or reckless. *See generally* Opp. to Mot. to Am. (Docket No. 24). Moreover, Epley's takes specific issue with the Court's decision allowing a punitive damages claim in the *Kane* action, arguing that "the evidence on which plaintiffs, and in turn, the Court, relied did not actually establish any such representations; that is, the record is undisputed that such representations were not made." *See id.* at p. 4.

## II.     DISCUSSION

### A. Punitive Damages Standard

Under Idaho law, to prove a claim for punitive damages, the claimant "must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted. I.C. § 6-1604(1). Whether to allow a claim of punitive damages is a substantive question controlled by Idaho law. *See Windsor v. Guarantee Trust Life Ins. Co.*, 684 F. Supp. 630, 633 (D. Idaho 1988). Ultimately, an

---

[3] Plaintiffs also claim that the use of inexperienced and inadequately trained guides, coupled with the absence of any safety plan, contribute to the wrongful conduct auguring in favor of a punitive damages claim against Epley's. *See* Mem. in Supp. of Mot. to Am., p. 17 (Docket No. 23, Att. 3) ("In sum, Defendant's decision to permit commencement of the trip on June 24, 2014, with minors as young as 14 and unfit 50-year olds, at flows in excess of 23,000 cfs, under the supervision of inexperienced and unqualified guides, with no alternative safety plan in place, constituted an extreme deviation from the standard of care. At 23,000 cfs, Defendant knew the group would encounter Class V or VI rapids at the Slide. There simply existed no rational justification for allowing this group to launch on June 24, other than for financial gain.") (internal citations omitted).

**MEMORANDUM DECISION AND ORDER** - 5

award of punitive damages requires a bad act and a bad state of mind. *See Todd v. Sullivan Const. LLC*, 191 P.3d 196, 201 (Idaho 2008). The defendant must (1) act in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – the likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, or outrageousness. *See Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho 2004); *see also* I.C. § 6-1604.

At trial, the party alleging punitive damages must satisfy this standard by clear and convincing evidence. *See* I.C. § 6-1604(1). However, for purposes of a motion to amend, the party seeking to add a claim for punitive damages does not need to meet this high burden; rather, the party need only show "a reasonably likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* I.C. § 6-1604(2). Therefore, although Rule 15(a) encourages the trial court to liberally grant motions to amend pleadings, this policy is constrained by the requirements under Idaho law. That is, plaintiffs may add a claim for punitive damages only if they establish a reasonable likelihood of proving, by clear and convincing evidence, that the defendant's conduct was oppressive, fraudulent, malicious, or outrageous.

Since plaintiffs are only required to demonstrate a "reasonable likelihood" of establishing their entitlement to punitive damages, on motions to amend to assert a claim for punitive damages under Idaho Code § 6-1604(2), courts apply the same standard as applies in resolving an FRCP 50 motion at the close of plaintiffs' case. *See Bryant v. Colonial Sur. Co.*, 2016 WL 707339, *3 (D. Idaho 2016). That is, evidence is viewed in the light most favorable to

plaintiffs, with the benefit of all legitimate inferences without assessing credibility. *See id.*
(citing *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)).

Subject to such a template, it is in the trial court's discretion to decide whether to submit the punitive damages issue to the jury. *See Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (Idaho 1992). As a matter of substantive law, it is well-established in Idaho that punitive damages are not favored and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits. *See id.* at 1185; *see also Jones v. Panhandle Distribs., Inc.*, 792 P.2d 315 (Idaho 1990); *Soria v. Sierra Pac. Airlines, Inc.*, 726 P.2d 706 (Idaho 1986); *Cheney v. Palos Verdes Inv. Corp.*, 665 P.2d 661 (Idaho 1983); *Linscott v. Rainier Nat'l Life Ins. Co.*, 606 P.2d 958 (Idaho 1980).

**B. Plaintiffs May Assert a Claim for Punitive Damages Against Epley's**

The Motion to Amend is focused on the actions and decisions surrounding the events leading up to the ill-fated attempt to run Slide Rapid on June 27, 2014. The Court is persuaded, in the exercise of its discretion, that the evidentiary record concerning such actions and decisions (viewed in the light most favorable to Plaintiffs), gives rise to a reasonable likelihood of Plaintiffs being able to prove, by clear and convincing evidence, that Epley's engaged in a bad act,[4] with a "bad state of mind," so as to support a claim for punitive damages.

---

[4] As one might expect, the arguments surrounding the question of whether Epley's conduct amounted to an extreme deviation from industry standards (the bad act) are identical to those raised (and already resolved) in the *Kane* action. To be sure, Epley's opposition to the instant Motion in *this* case focuses less on any alleged bad act, but rather on whether it had the requisite bad state of mind contemporaneous with the assumed bad act – consistent with Epley's argument that the evidence relied upon to inform Epley's alleged bad state of mind in the *Kane* action was not actually supported by the record. *See generally* Opp. to Mot. to Am., pp. 3-7 (Docket No. 24) (challenging Court's previous ruling in *Kane* action by revisiting evidence relied upon to support finding that Epley's acted with extremely harmful state of mind). These more recent arguments are addressed elsewhere in this Memorandum Decision and Order (*see infra*), and the Court finds no reason to depart from its earlier analysis of and conclusion upon the issue of an alleged bad act.

**MEMORANDUM DECISION AND ORDER** - 7

1. <u>Bad Act: Extreme Deviation from Reasonable Standards of Conduct</u>

In the days leading up to, and including the June 24, 2014 launch, Defendant's manager and guides were aware that water levels on the Salmon River consistently measured higher than 23,000 cfs and that, on June 24, 2014, the water level forecasted for June 27, 2014 (the day the group was scheduled to reach Slide Rapid) was approximately 21,000 cfs. *See* Mem. in Supp. of Mot. to Am., pp. 7-8 (Docket No. 23, Att. 3) (citations omitted).[5] Still, Epley's decided to proceed with the trip and, according to Plaintiffs, did so with "no plan whatsoever" to address the anticipated flow levels at Slide Rapid in the event water flow volumes remained dangerously high. *See id*. at p. 8 ("Notwithstanding the extreme water level, the inexperienced, unfit passengers, and the want of cause to believe the river volume would drop, Defendant launched the excursion.") (citations omitted).

Flow levels did not appreciably change over the course of the trip and, on the morning of June 27, 2014, Epley's guides could see that the river flow had actually increased overnight as the party camped at Eagle Creek (the last overnight location before reaching Slide Rapid). *See id*. at pp. 8-9 (citations omitted). Still, Epley's decided to proceed through Slide Rapid with allegedly unqualified guides, foregoing options to use an available satellite phone to discuss potentially safer options for the inexperienced group, or to portage around Slide Rapid,[6] or to use a motorized raft or jet boat to transit Slide Rapid, or to altogether exit the river on land at Eagle Creek (the last place where the group could have readily done so). *See id*. (citations omitted).

---

[5] It is undisputed that, at levels over 20,000 cfs, Slide Rapid is a Class V (expert) or Class VI (extreme and exploratory) rapid. *See* Mem. in Supp. of Mot. to Am., p. 5 (Docket No. 23, Att. 3) (citations omitted).

[6] Plaintiffs claim that another outfitter, Exodus River Adventures, ran the Lower Salmon River during the same time frame and, on June 26, 2014, portaged around Slide Rapid rather than running it at similar flows. *See* Mem. in Supp. of Mot. to Am., pp. 9-10 (Docket No. 23, Att. 3) (citations omitted).

**MEMORANDUM DECISION AND ORDER** - 8

Epley's disputes Plaintiffs' contentions about forecasted flows for Slide Rapid in the days leading up to June 27, 2014, believing them to be lower. *See* Opp. to Mot. to Am. in Case No. 3:15-cv-00105-EJL-REB, pp. 4-5, 14 (Docket No. 22) ("Despite Plaintiffs' incorrect assertions, the Northwest River Forecast website continued to predict that the Lower Salmon River water level would drop to below 20,000 cfs by the time the group was to reach the Slide.") (citations omitted). Consistent with this, the BLM officials present at the launch site on June 24, 2014 neither warned the group not to go, nor stated any concern about the water levels whatsoever. *See id*. at p. 6 (citation omitted). And, as to precautions taken before hitting Slide Rapid itself, Epley's notes that its guides (who it contends were state-licensed and experienced) conducted a safety talk on the morning of June 27, 2014 and, before reaching the Slide Rapid, pulled the group's rafts to shore to scout and pick the safest line to run – the "Sneak" down the left bank, with identified spots to "eddy out" at the bottom of the run "in case any individuals fell out during the rapid and they needed to perform a rescue." *Id* at pp. 6, 15-17 (citation omitted).

The parties' arguments contain disagreement about the standard of care applicable to Epley's actions leading up to Plaintiffs' alleged injuries. Judge Lodge stated as much in the *Kane* action when considering the defendant's (Epley's) motion for summary judgment, discussing the relevant standard of care as follows:

> A question of fact exists, however, concerning what the standard of care is in this case; i.e., what ordinary care Epley's, as an outfitter, owed to Plaintiffs, as its customers/participants. The parties dispute the testimony of the expert witnesses offered to opine regarding the standards of the profession and the use/relevance of certain public information and industry publications to define the standard of care – in particular the standard of care in the profession for outfitters running the Slide Rapid above 20,000 cfs

> Each sides' expert witnesses offer differing opinions concerning the standard of care applicable to the circumstances presented in this case. In his report, the Defendant's expert, Gary Lane, states that he used a 25,000 cfs cut-off for running commercial trips at the Slide Rapid but that "it has long been the standard practice and is the practice today for commercial outfitters on the Lower Salmon River to

**MEMORANDUM DECISION AND ORDER** - 9

take commercial trips down the Lower Salmon, including the Slide Rapid, at flows up to and exceeding 25,000 cfs" and concludes that Epley's conformed to the standard of care expected of outfitters and guides rafter the Lower Salmon at the Slide Rapid with this group, gear, and at water levels higher than 20,000 cfs. Plaintiffs' expert, on the other hand, conclude the Defendant violated the standard of care with regard to running the Slide Rapid above 20,000 cfs under the circumstances of this case. Resolving the disputed questions presented by the experts' testimonies requires the weighing of evidence and credibility determinations which must be done at trial.

*Kane v. Epley's, Inc.*, 2016 WL 7155734, *8-9 (D. Idaho 2016) (internal citations omitted).[7]

Similarly, whether Epley's breached any duty of care is also disputed, with Judge Lodge also ruling in the *Kane* action:

> For the same reasons discussed above with regard to duty, the Court finds a genuine issue of material fact exists as to whether Defendant breached the standard of care applicable in this case. This case presents the classic example of a battle of experts where both sides have presented contradicting testimony from experts concerning whether the Defendant breached a duty of care owed to Plaintiffs. Further, the facts surrounding events in question relevant to the breach issue are in dispute. For instance, the conditions presented on the day in question; what the guides knew regarding the water flow level of the Slide Rapid; whether there was a rescue plan and if that plan was followed; and any safety procedures in place and used by the guides. The jury, as the finder of fact, must consider all of the disputed facts, the credibility of the witnesses, and the weight of the evidence in order to determine whether Defendant breached its duty. Therefore, summary judgment is denied on this question.

*Id*. at *10.

Therefore, viewing the evidence in the light most favorable to Plaintiffs, and giving Plaintiffs the benefit of all legitimate inferences without assessing credibility, Plaintiffs have

---

[7] Judge Lodge also considered the "public information and industry publications" in determining the appropriate standard of care for Idaho outfitters running commercial trips on the Lower Salmon River generally, and when Slide Rapid experiences high flows. *See Kane v. Epley's, Inc.*, 2016 WL 7155734, *8-9 (D. Idaho 2016). This examination included the BLM's Lower Salmon River Boater's Guide, the American Whitewater Safety Code, outfitter websites, and industry blogs (including one by the defendant's (Epley's) expert, Gary Lane). However, Judge Lodge determined that this information did not highlight the standard of care as a matter of law. *See id*. at *10 ("While these materials do not, in and of themselves, define the standard of care, and their admissibility and/or use at trial is not decided here, the materials do show a genuine issue of material fact is present in this case concerning the applicable standard of care.").

**MEMORANDUM DECISION AND ORDER** - 10

established a reasonable likelihood of proving by clear and convincing evidence that Epley's acted in a manner that was an extreme deviation from reasonable standards of conduct with an understanding (as an experienced outfitter) of – or disregard for – the likely consequences of those actions. *See, e.g.*, *Morningstar Holding Corp. v. G2, LLC*, 2012 WL 287517, *14 (D. Idaho 2012) ("It is true that '[w]here evidence is conflicting, and where it can be said that if one theory of the case is correct there may be ground[s] for the imposition of exemplary damages, the matter is properly submitted to the jury' to determine the correct theory.") (quoting *Williams v. Bone*, 259 P.2d 810, 813 (Idaho 1953)). As ruled by Judge Lodge in *Kane*, it also will be for the jury in this case to resolve the issue of the actual standard of care involved and, relatedly, whether Epley's breached that same standard in the days and moments leading up to Plaintiffs' alleged injuries.

2. <u>Bad State of Mind: Acting With an Extremely Harmful State of Mind</u>

As in the *Kane* action, Plaintiffs assert that Mr. Blackner, the manager of Epley's, told Marlene Schaefer, who helped organize the rafting trip, that (1) Epley's followed "BLM criteria" in determining whether to launch on the Lower Salmon River, and (2) they would not launch if the water was above 20,000 cfs – the "go or no-go" limit. *See* Mem. in Supp. of Mot. to Am., p. 17 (Docket No. 23, Att. 3) (citations omitted). Plaintiffs also contend that Mr. Blackner assured Ms. Schaefer that he was monitoring river flows, and expressed concern that they might not be able to launch on the date planned and that they may have to "take an alternative trip if the water was over 20,000 cfs." *Id.* at p. 18 (citation omitted).

Yet, according to Plaintiffs, Mr. Blackner did not tell Ms. Schaefer at the June 24, 2014 launch that the water level was above 23,000 cfs, but did say that the water levels would be dropping to 17,000 cfs at Slide Rapid and, if they did not drop in time, they could alter the plan

**MEMORANDUM DECISION AND ORDER** - 11

and take out at Eagle Creek or run a different route.[8] *See id*. (citations omitted). Mr. Blackner allegedly made these representations despite the fact that river level forecasts for June 27, 2014 (the day the group was scheduled to reach Slide Rapid) was, in reality, approximately 21,000 cfs. *See id*. (internal citations omitted). In other words, Plaintiffs argue that Mr. Blackner purposely misled Ms. Schaefer and, thus, the rafting party, by failing to inform them of actual (as of the June 24, 2014 launch date) and projected river flows (for the anticipated encounter with Slide Rapid on June 27, 2014) – that is, it was fraudulent and outrageous for Mr. Blackner to say that the forecasted flow for Slide Rapid on June 27, 2014 was 17,000 cfs, when, in actuality, it was much higher. *See id*. at pp. 18-19.

In the *Kane* action, there was a dueling factual account of what was said between Mr. Blackner and Ms. Schaefer surrounding the circumstances in which the group would (or would not) proceed with the as-planned trip, but the undersigned ultimately concluded that the plaintiffs had established a reasonable likelihood of proving by clear and convincing evidence that Epley's acted with a harmful state of mind which, coupled with its bad act, warranted a claim for punitive damages:

> [S]uch evidence and inferences must be viewed to Plaintiffs' benefit when considering Plaintiffs' efforts to amend their Complaint to assert a claim for punitive damages. When doing so, Plaintiffs have clearly established a reasonable likelihood of proving by clear and convincing evidence that Epley's not only acted in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – the likely consequences of those actions, but also did so with a harmful state of mind when viewing Mr. Blackner's statements to Ms. Schaefer as fraudulent and/or outrageous. Whether Epley's actually acted with such a harmful state of mind to support an award of punitive damages is therefore a question for the jury, and not the subject of this Memorandum Decision and Order.

---

[8] Plaintiffs contend Ms. Schaefer was also present with the inspection team at the launch, but Epley's contests that fact. *See infra* (discussing whether Ms. Schaefer was, in fact, present at actual launch site).

**MEMORANDUM DECISION AND ORDER** - 12

*Kane*, 2017 WL 1158242 at * 8 (internal citations omitted).

Now, in this action, Epley's argues that such reasoning no longer applies. Specifically, Epley's argues that (1) "Ms. Schaefer was not present with the inspection team at the launch," and (2) "Mr. Blackner did not say the water levels would be dropping to 17,000 cfs at Slide Rapid on June 27, 2014." Opp. to Mot. to Am., p. 5 (Docket No. 24). Therefore, Epley's contends, that there is insufficient evidence to allow Plaintiffs to amend their Complaint (presumably in both this action and the *Kane* action). *See id*. at pp. 5-6 ("Very simply, Plaintiffs' citations to the record which it argued established that Mr. Blackner purposely made misrepresentations of river levels in order to deceive the participants into proceeding with the trip, establishing the harmful state of mind, was not supported by the record. Contrary to the Court's determination that there was simply conflicting interpretations of evidence that must be resolved by the jury relative to this harmful state of mind, the record **does not** establish that these misrepresentations occurred, and thus insufficient evidence exists to allow plaintiffs to amend this Complaint.") (emphasis in original).

The evidence, however, is not as clear-cut as Epley's now argues. First, Epley's correctly notes that Ms. Schaefer testified that she was not at the launch site on June 24, 2014. *See* Schaefer Dep. at 33:9-12, attached as Ex. C to O'Brien Decl. (Docket No. 24, Att. 1) (Ms. Schaefer testifying that she "was not at the launch site"). But this misses the point. Even if she was not physically present at the launch site, Ms. Schaefer was at least present on the day of the launch. *See* Schaefer Dep. at 28:18-19, attached as Ex. X to Kuhling Decl. (Docket No. 23, Att. 15) (Ms. Schaefer testifying that she was "there" on day of launch). In short, Epley's highlights a distinction which may not create an impossibility, especially when considering that the import of Ms. Schaefer's testimony relates to what Mr. Blackner allegedly said to her prior to the rafting trip's launch.

**MEMORANDUM DECISION AND ORDER** - 13

Second, despite Epley's latest arguments, it is still not clear from the record (as Epley's claims is unquestionably the case) that Mr. Blackner did not misrepresent projected river flows for June 27, 2014 – the day the group was scheduled to reach Slide Rapid.[9] For example:

- Although Epley's argues that "Mr. Blackner did not say the water levels would be dropping to 17,000 cfs at Slide Rapid on June 27, 2014," it then goes on to cite Mr. Blackner's deposition testimony, stating: "We got everybody together that night, and I brought up the USGS website, and then I went from the USGS website to the Northwest Service, Weather Service and they actually have a prediction and we – we watch that prediction . . . . **I showed [the prediction] to everybody**. I showed it to him that night. And with the projection, *it was supposed to be able to come down to 17, 17,5, somewhere in that area*, and we showed it again to him, including the inspection team." Opp. to Mot. to Am., pp. 6-7 (Docket No. 24) (quoting Blackner Dep. at 91:12-92:17, attached as Ex. D to Kuhling Decl. (Docket No. 23, Att. 5) (bold in original, italics added)).

- Similarly, Epley's states that "Roger [(Blackner)] showed the group and the inspection team the river forecast website which would have showed the chart of predicted data of 18,000-19,000 cfs, *not an arbitrary number of 17,000 cfs*," but Mr. Blackner's above-cited deposition testimony indicates otherwise. *Compare* Opp. to Mot. to Am., p. 5 (Docket No. 24) (emphasis added), *with* Blackner Dep. at 91:12-92:17, attached as Ex. D to Kuhling Decl. (Docket No. 23, Att. 5).

- Epley's states (without support) that, "[a]t the time of his deposition, more than a year after the accident, neither party, nor Mr. Blackner, had seen the prediction data later received from NWS." Opp. to Mot. to Am., p. 5 (Docket No. 24). But Mr. Blackner's above-cited deposition testimony suggests that, before launching on June 24, 2017, he "went from the USGS website to the Northwest Service, Weather Service, and they actually have a prediction . . . ." *See*

---

[9] This lack of certainly was highlighted during the November 21, 2017 hearing on Plaintiffs' Motion to Amend when it became clear that neither counsel could articulate a clear understanding of the numbers referenced within the data published by the National Weather Service (NWS), *including the available information as of June 23, 2014 for the forecasted flows on the Lower Salmon River on June 27, 2014*. Yet, Epley's relied centrally upon such information in making its argument that there could not have been a misrepresentation of projected river flows. Because of this uncertainty (and the obvious significance of this information), the Court requested that the parties supplement the record addressing this lynchpin issue. *See* 11/21/17 Minute Entry (Docket No. 34). To their credit, on November 30, 2017, the parties submitted a Stipulation, once-and-for all agreeing upon the flow projections for the Lower Salmon River on June 27, 2014, as of June 23-24, 2014. *See* Stip. (Docket No. 36). The parties then filed supplemental briefing with the Stipulation in mind. *See* Supp. Briefs (Docket Nos. 37 & 38).

**MEMORANDUM DECISION AND ORDER** - 14

- Blackner Dep. at 91:12-92:17, attached as Ex. D to Kuhling Decl. (Docket No. 23, Att. 5).

- Despite Mr. Blackner's above-cited deposition testimony that the projected flows for Slide Rapid were "supposed to come down to 17, 17,5, somewhere in that area," on June 23, 2014, the actual projected flows for the Lower Salmon River on June 27, 2014 were between approximately 18,663 cfs and 19,222 cfs. *Compare* Blackner Dep. at 91:12-92:17, attached as Ex. D to Kuhling Decl. (Docket No. 23, Att. 5), *with* Stip., p. 3 (Docket No. 36).

- On June 24, 2014, the actual projected flows for the Lower Salmon River on June 27, 2014 had risen to between approximately 20,049 cfs to 20,516 cfs. *See* Stip., p. 3 (Docket No. 36). Epley's argues that "[t]he group did not have the data from June 24, 2014, at the time of launch because it was not published until 16:39 (4:39 p.m.), hours after the group launched at Hammer Creek." Opp. to Mot. to Am., p. 5 (Docket No. 24). Except these projected flows were made at 10:39 a.m., not 4:39 p.m. *See* Stip. pp. 2-3 (Docket No. 36).[10]

The Court has carefully considered Epley's perspective on these points, but for the Court they remain factually troublesome and to a degree that the Court, on this record, cannot reconcile. For example, what information did Mr. Blackner review prior to the trip's June 24, 2014 launch and in what form (chart or graph) and, thus, what exactly did he relay to the inspection team? *See generally* Supp. Mem. in Opp. to Mot. to Am. (Docket No. 38). Epley's would argue that such details dovetail with its arguments opposing a punitive damages claim, but the Court can only consider the record before it. On this record, construing conflicting interpretations of the evidence in Plaintiffs' favor as the Court must do, the Court is persuaded, again, that Plaintiffs have "established a reasonably likelihood of proving by clear and convincing evidence that Epley's not only acted in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – the likely consequences of those actions, but also did so with a harmful state of mind when viewing Mr.

---

[10] In its Supplemental Memorandum, Epley's argues that Mr. Blackner did not review the June 24, 2014 forecast, with the trip launching "at about 7 a.m." Supp. Mem. in Opp. to Mot. to Am., p. 4 (Docket No. 38).

**MEMORANDUM DECISION AND ORDER** - 15

Blackner's statements to Ms. Schaefer as fraudulent and/or outrageous." *Kane*, 2017 WL 1158242 at *8; *see also Morningstar*, 2012 WL 287517 at *14 (discussing role of jury to resolve conflicting evidence in context of exemplary damages). Whether Epley's actually acted with such a harmful state of mind to support an award of punitive damages is not the subject of this Memorandum Decision and Order but, rather, is a question for the jury.[11]

### III. ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiffs' Motion to Amend Complaint to Assert Punitive Damage Claim (Docket No. 23) is GRANTED.

DATED: January 16, 2018

Ronald E. Bush
Chief U.S. Magistrate Judge

---

[11] The decision to grant Plaintiffs' Motion to Amend Complaint to Assert Punitive Damages Claim does not guarantee the claim will go to the jury. Judge Lodge will preside over the trial of the case and it will be within Judge Lodge's province to decide, after hearing the evidence, whether the jury should decide the issue of punitive damages at trial. *See, e.g.*, *Clark v. Podesta*, 2016 WL 4179851 at *8 (D. Idaho 2016) (Judge Lodge stating on facts of that case: "It is premature for the Court to make a binding decision on punitive damages until the close of evidence. Only then can the Court determine if evidence has been presented that Podesta acted with the requisite state of mind to allow punitive damages to be considered by the jury. Accordingly, the Court will allow the motion to amend the Complaint but will reserve ruling on whether such claim will be decided by the jury . . . .").

**MEMORANDUM DECISION AND ORDER** - 16